One patent case, a government contract case from the Court of Federal Claims, three government employee cases, and a veteran's claims case. The veteran's case and one of the employee cases are being submitted on the briefs and therefore will not be argued. Our first case, patent case, is Takeda v. Mylan in alpha form, 2007-1269 and 1270. We've got a lot of participants here and I understand first will be Mr. Haug. Mr. Haug and then Mr. Rucosi. And then we'll hear from Mr. Goldstein, representing Menelikis, and Mr. Conlon. And then we'll come back for whatever response time Mr. Haug and Mr. Rucosi have. So Mr. Haug can begin. I'm more than happy to please the Court, Edgar Haug, for the appellants, alpha form and gen form. Affirmance of this case, we believe, will turn Hatch-Waxman litigation on its head. The district court here, in connection with an exceptional case motion found, that the ANDA applicants are obligated to follow what's in their notice letter, that it is an act of litigation misconduct to add arguments or add claims that are not set forth in a notice letter that is a pre-suit document, as well as to not pursue claims that are in their notice letter. And it's our view that, first off, alpha form, we don't believe, engaged in any litigation misconduct. There was no finding of subjective bad faith intent. Alpha form believed what it had set forth in its notice letter, that the Takeda patent was invalid for obviousness. It continued in that belief throughout the litigation. Mr. Haug, viewed in its totality, the alpha form statement is so devoid of merit and so completely fails to establish a prima facie case of invalidity that it must be described as baseless. That's not just an offhand comment. That's a small portion of a 50-page, well-reasoned opinion by one of the most eminent district judges that I've encountered. Baseless, that's what she says. And she uses the word over and over again and substantiates it repeatedly. It isn't just an offhand comment. She really reasons through it. There's no question, Your Honor, that the trial judge felt very, very strongly about the case, both on the science and on the law, throughout the trial, throughout the proceedings. No question, and we have tremendous respect for Judge Coate. Our research is, I'm not sure that Judge Coate ever had a Hatch-Waxman case before. But we lost the case on the merits. We're very disappointed, but we respect the decision both of Judge Coate as well as this panel, which affirmed the loss on the merits. She said it wasn't even a close case. You were baseless. That's where we're at here. Yes, we are, Your Honor. And we think that there was no, she did, it's clearly erroneous to have found based on the record here that this was baseless. She also used the word frivolous multiple times, specious. And she, as Judge Rader said, she spent a long time on this case and with counsel, et cetera, and witnesses. I think, yes, she did, Your Honor. She worked very hard at the case. There's no question. However, I think to find this to be an exceptional case on the basis that Alphaform had absolutely no basis to believe that this patent was invalid for obviousness based on the very close structural similarity of the compound that it focused on. Well, she didn't leave us just to guess. Let's look what she actually says on that obviousness point. She refers to Dr. Rosenberg's statement, the head of Alphaform's intellectual property department, and his comment that there was nothing to recommend the lead compound other than its similarity. And she says this is a stunning admission that Alphaform worked backwards to identify what it would contend was a lead compound. She goes on to say that's part of the reason for the frivolousness of your case. That's what she said, and we respectfully disagree. So, in other words, she reasons through it. How do we deal with that? Well, we deal with it. Dr. Rosenberg, who is a PhD scientist, was deposed and did believe that the patent was obvious and did believe that this was a lead compound that was very structurally similar, and that is the compound that would be modified and would be obvious to do so by a person of ordinary skill, which he was. That's what he believed then. He still believes it. I think Judge Cote substituted her view of the facts and the law and imported that, imposed that on Alphaform right from the get-go, from the notice letter stage right through the litigation. We respect the decision. We respect the decision that was affirmed. However, there was no subjective bad faith intent. There is absolutely no evidence that Alphaform at any time believed that this was a frivolous case, that they just slapped something together to get it going. They spent millions and millions of dollars to prepare, to file this ANDA and to prepare for this case. There was a lot of time that went by to study not only the patents but the science involved. This was not a frivolous case. This went on for many, many years. During the course of discovery, in Judge Cote's opinion, I think it's on page JA5960, she talks about commercial success and says that it's litigation misconduct because commercial success is the most important factor in non-obviousness, which we disagree as a matter of law. In addition, Judge Cote said, there is significant commercial success here for Actos because it's being sold, hundreds of millions of dollars worth. That's wrong. Just because it's being sold doesn't mean it's commercially successful. And then lastly, Judge Cote found that it's litigation misconduct because Alphaform should have known that, no discovery was required, and that it should have been put in the notice letter, namely that Alphaform should have admitted in its notice letter that there was commercial success. It's clearly erroneous on the law and on the facts. Do you want to let us hear from Mr. Mercosi and save some time? Mr. Mercosi, you are for Mylon. Yes, Your Honor. William Mercosi on behalf of the Mylon appellants. Mylon also challenges, obviously, the exception of case award as well as what Mylon believes to be the complete unreasonableness of the award. But there are two primary bases for the award against Mylon. The first one was an unlitigated pre-suit obviousness theory. Now, let's think about this. This was a notice theory... Do you want to tell us about the 16-hour turnaround story? Your Honor, I would, Your Honor, but first I'd like to make one quick point on that, which is that's a pre-suit conduct. I mean, you've got... Everyone knows when these dates are going to happen and when something's going to be eligible for challenge. You've got months, years to prepare your Hash-Waxman case, and you have to generate an opinion in a 16-hour turnaround. That suggests that there's a lot to substantiate Judge Coates' opinion, doesn't it? Well, we would disagree, Your Honor, because as a matter of law... Help me out there. Why didn't you do that work 6 months ahead instead of 16 hours ahead of the deadline? Well, Your Honor, just because Mylon got an opinion of counsel just before the ANDA doesn't mean it doesn't mean... Because you couldn't get it from another firm who said nobody can do that kind of work in that short a time. Your Honor, I'm not sure that's the actual evidence. Please help me. Please explain if I've misunderstood what I thought was the gist of the story. Well, there was... Mylon's in-house counsel, there was evidence in the record that she was involved in looking at this patent. Now the court below disparaged that and said, well, during her deposition she couldn't remember everything she did. That doesn't mean that Mylon didn't consult counsel. The objective and undisputed facts here are that Mylon's in-house counsel was, in fact, looking at that patent, was, in fact, working with outside counsel. They did, in fact, get an opinion before they got the ANDA filed. They got a second opinion after they filed it. They got yet a third law firm to do the actual trial in the paragraph 4 notice letter. Those are the only undisputed facts in this record. Everything else is speculation about Mylon's pre-suit business motives and intent. For example, the court disparaged the fact that Mylon didn't have an opinion before they sent a line-stander to FDA. These types of things, Your Honor, are irrelevant as a matter of law under this court's precedent, including the Forrest v. Abbott Labs case. Secondly, as this court has held, you cannot draw adverse inferences against Mylon or any other company for failing to get an opinion of counsel. But the fact's hard that they did get opinions. They got at least two, and their in-house counsel was looking at this patent and consulting with outside counsel as well. So the only facts are that there are subjective good faith on Mylon's part to address this patent before its ANDA filing. And it's unreasonable to assume that a company spends millions of dollars developing, millions of dollars filing, going into a case searching for a theory. The facts here are Mylon addressed the patent, they did have a theory, they went through discovery, and they got an even better theory and took it to trial. The fact that they narrowed, dropped, or added defenses based on discovery shouldn't be held against Mylon. It should have been welcomed by the district court. That's pain. I guess she thought that you never really had a real theory, that statements in your ANDA were wrong and that it was just thrown together and that you were just fishing for a theory as you went along. Shifting arguments, conflicting arguments. Excuse me for supplementing our presiding judge's comment. I appreciate that. I think that was actually an important point. She held it was exceptional based on an unlitigated pre-suit notice theory. And again, let's think about this. This is like a mini-trial on the notice letter. No one ever litigated that original theory. There was no expert testimony on it, no fact findings, and clearly no trial. So first off, there was no basis to say that theory was in bad faith or baseless and certainly no evidence of subjective bad faith. But let's look at what that original theory was. But Judge Coates said explicitly in her opinion that she did not draw such an adverse inference. She held that it was baseless. The initial theory, she said in her opinion, was baseless in that Mylon knew it from the get-go. Well, first off, there's no evidence that Mylon knew or pursued a theory thought to be baseless. And secondly, that theory was not baseless. It was extraordinarily close prior art. The notice letter described the prior art, the claims, the prosecution. Was there any testimony at any time as to why one of ordinary skill in the art would have chosen that lead compound out of the thousands of structurally similar compounds? There were many that were even closer structurally than this one. Was there any testimony as to why you chose that one out of the thousand other candidates? That is the key to this, Your Honor, is that that theory was never pursued. There never were expert testimony on that theory or on that prior art compound because Mylon didn't pursue it. As discovery went, Mylon dropped defenses and added others. There was never expert testimony or fact-finding on that piece of prior art compound. But if we look at the compound, we would suggest it's extraordinarily close. It's a benzene versus a pyridyl ring, a carbon-nitrogen replacement. The notice letter relied on this court's Merck decision. It said that type of close structural similarity plus similar biological activity, which was admitted here, was more than enough for motivation, reasonable expectation of success, and prima facie case of validity. So we would dispute that that notice letter was baseless. But even more key was the Ditch Report had no evidence to say it was because it was unlitigated. It never went to trial. Mylon never had any expert testimony on it because they had dropped it. The post-suit conduct was not exceptional either. Mylon did here exactly what the federal rules in this court contemplates and encourages. It took discovery, it ascertained the facts, and then it did what the judge should have welcomed. It dropped and narrowed the issues for trial. And that's especially true in inequitable conduct, which has to be put with particularity and shouldn't be put out of the box unless you've got the evidence to do it. Oftentimes it can't be because the evidence is in the exclusive control of the patentee. And that was the case here. Mylon didn't even get the information it was seeking until well after a year in. It saw all the activity in structure and toxicity data in February 2004. It didn't get it until April of 2005. It didn't get to take depths of the inventor until the end of April, and it pled it in May. There's no evidence that Mylon delayed to hamstring Takeda as the district court found. Do you want to save a little time for both yourself? I will, Your Honor. Thank you very much. Mr. Goldstein for Amicus Curiae, if I have the name correctly, Generic Custodial Association. Yes, Your Honor. May it please the court, counsel. I think I can help the court identify what are some legal errors, we believe, rather than trying to second-guess any factual determinations by Judge Coates, and help the court develop a wise rule that balances the need to stop litigation and misconduct with Congress' determination not to deter hatch-waxman violence. And I think the problems that we see really do arise from Judge Coates' treatment of that and his certification. And there are three issues that we have, three concerns about a court of appeals opinion affirming the judgment in this case, creating too great a deterrent for hatch-waxman filings, too great a prospect of $5, $10, $15 million attorney-of-fee awards, and inhibiting the hatch-waxman process. And here are the three concerns that we have. The first is... It seems to me everything turns on her finding that it was baseless. I agree, Your Honor. And you certainly are not going to argue that there ought to be no implications for filing a baseless, frivolous lawsuit. Absolutely, Judge Rader. Even if Congress seems to give an incentive for the filing of such suits which are not baseless or frivolous. Your Honor, I absolutely agree. My point, if I could just put it in the terms of your question, is that I think she had three views of the law that informed her determination that these filings were baseless. So it's not just about the facts, but what she thought the role of the end of filing was. So if I could just make those three points. The first is she attributed significant weight to the change in the theory from the end of certification to the theories at trial. Now, we list in our amicus brief a series of this Court's decisions, including cases involving Paxil and Prozac, really important cases, where it's commonplace for that sort of change. And indeed, the Court's decision in Yamanuchi encourages generics not to pursue theories that turn out not to have value and not to be correct as the case goes along. Because if they do, they're subject to attorney's fees. So this Court really tried to guide the generics to say... It still sounds like fishing. I mean, one looks at prior art. The prior art is out there. It is known. And if the prior art indicates that a claimed compound lacks novelty or would have been obvious, then that's right out there. I mean, if there's a significant meritorious basis for arguing invalidity, then that should be apparent from the beginning. And if there isn't, and one is scrambling around, as the district judge here apparently felt that the parties were, then that's what leads to a filing of baselessness. Well, Judge, I'm not trying to argue that the anti-certification process allows you just to throw something down on paper and let's get the ball rolling. That's not what she thought happened. Well, Judge, I think that she inferred that from, again, the three points. I'm not trying to get into the weeds of this particular case. I'm not trying to resist your question. But I do think she inferred bad faith, really, from three things here, in addition to other evidence. And our concern is with the rule of law that treats those inferences themselves as meritorious. So if I could just make the other two points as well. The second point is that she required a high level of detail in the certification. So, for example, she attributes bad faith for the fact that the certification doesn't negate commercial success. And that really requires an extraordinary understanding of how the case is going to be litigated from the very beginning. So there are several points where she says, look, the trial proved that this was an extraordinary commercial success. And she said you don't negate the counter defenses to obviousness. And the third point is that we think she looked at this from a post hoc approach. She said several times, it turns out that your theory here was wrong. It was really, really wrong. Now that, I think, is if she had found that it was clear at the time that the notice letter was filed that it was clearly baseless. But she inferred from the fact that later in the trial, the anti-certification was proved to be meritless. But she also thought some of the statements in the original certification statement were wrong. Yes, that's right. And there's a big difference, Your Honor, between it being wrong and the conclusion in, for example, cases like McNeil v. El Perigo that there's clear and convincing evidence that it was done in bad faith. We think that she attributed too much weight to the level of detail and certitude that there had to be in the original and the following. If I could, it's important to juxtapose Yamanuchi, which is a case where the generic carried through the erroneous theory throughout the case, and Glaxo, which is the Yamanuchi successor, and says, look, the purpose of the ANDA filing is to get the ball rolling. We're not saying that a bad faith, frivolous ANDA certification combined with identification of misconduct doesn't qualify for Section 285. It does. But Glaxo teaches that you don't put too much weight on that initial certification. You don't treat it as a permanent statement of position. Let me ask you, if I could, a question. Going to the sources of whatever is required by way of detail in the paragraph for certification, these certifications are pretty detailed. What is required by way of detail, either by court decision or otherwise? Hatch-Waxman itself says that the notice letter as opposed to the certification. So we have the ANDA, the certification, the notice letter. And is your question about the certification or the notice letter, sir? Well, either of both. The notice letter just is, the certification is, this is a paragraph 4 case. That's what goes to the FDA. The certification goes only to the other side, not to the FDA, and it requires a detailed statement. The letter requires a detailed explanation of why it is that the case qualifies for paragraph 4. And the point of that notice letter, the Supreme Court has said and this Court has said, is to put the other side on notice that the generic is pursuing an ANDA certification. But it's more than just notice pleading. It is more than notice pleading. But so what we have here is the odd circumstance in which we might be holding the generic to a substantially higher standard than anybody else who sued for infringement. So Takeda sued the generics for infringement. When an ordinary patent defendant shows up in court, they aren't required to have an extraordinarily detailed set of defenses. And our point here is Congress, when it decided to give some more information to the brand name company, didn't decide to erect a much higher standard. That would be intentioned with the whole purpose of Hatch-Lack. Do you think the principles of Rule 11, by analogy, would apply to the certification, even though, of course, it's not a pleading as such, but do you think the general principles that apply to a Rule 11 sanctions analysis would apply? I do because what we're ultimately looking for is bad faith. We're looking for vexatious litigation, not vexatious premeditation. A failure to investigate sufficiently, which is one of the grounds. Well, two things. A failure to investigate, but also proceeding when you know. Remember, Rule 11, of course, says that the party who's opposed to the pleading will tell the pleader, we see a problem here. You better change. And you keep going. That's exactly right. That's Gammanucci. And what happened here is the reverse. Okay. Thank you. Thank you, Your Honor. Second, Mr. Goldstein. Mr. Conlon. Yes, Your Honor. We've had a long run here, but three people have responded. That's all right. I think I have the answers to all three, Your Honor. And one of the answers comes not from me, but from Judge Cote. With regard to using discovery to focus their opinion and saying that they're not entitled to do that, Judge Cote specifically pointed to that on JA 504. That's what they said at the time when she was considering JA 504 as part of her decision on their motion to add the new obviousness theory. And the judge said, my man misunderstands the law. Although, as a general matter, an and applicant may be able to assert theories other than those outlined in their notification letter. Quote, when the court has set and the parties have agreed to a discovery period, that procedure necessarily governs the trial. Specific judicial directive of the timing of discovery establishes the procedures to which the parties are bound. The judge says, sure, you can change, but you can't do it when it's going to change the discovery period that we've already agreed to. And I directed the court to JA 7955, and this is a wonderful example of what we're all talking about here. JA 7955. Actually, this whole opinion, this is her decision on motion for reconsideration of that decision where she had not allowed the new obviousness claim. Here, she reasserts the same legal basis, saying, yes, of course they can change their theory, but they can't do it when it's going to change the discovery period. And she details what they did, including delaying any discovery on the substance of the certification, of the substance of the notice. We tried to get Dr. O'Connor from January until May of that year. He supposedly developed a heart condition maybe for his deposition and was never available. She put an order in saying, you will produce a witness. Diabetes, the parties could have done something about, but not the heart condition. We did it. We did everything possible, and it shows a couple of things. It shows what kind of maneuvers were entertained, what kind of breaking of the rules went on for that whole six-month period. These fellows weren't there, but I was there, and I know it very well. We finally did get a 30B6 witness. And what my eyes counsel says, there was no evidence that their own submission was specious. Their own 30B6 witness said there was nothing at all to recommend compound 14, which was a benzo compound, not even related. There was nothing at all to recommend that above any of the other disclosures in judge, and so was reference. Mr. Coleman, the district judge said a couple of times that Myrand and Alphaphone failed in their duty of due care in their formulation of their anti-statements. Where does that duty come from? Where is it set out, the duty of due care, in filing an ANDA statement? First of all, I was shocked by what was just said about what the certification is. The certification that's required by the statute is not merely a certification that this is a paragraph 4 case. The certification is that this company had, to the best of its opinion and the best of its knowledge, this patent is invalid. That means that they've looked at it, and the patent that they're going after is invalid to the best of their opinion. That's, I would say, at least due care, and Yamanuchi certainly talked about due care, specifically about due care. But here, Judge Cote went far beyond due care. She found bad faith. She specifically found bad faith. You'll find that term, that finding, about 14 times during her opinion. She found that they were far beyond gross negligence. There was no question here of just holding them to a negligence standard. She said they didn't use due care, but she went even beyond that. So I think there's no, in this case, there's no grounds to assault her opinion on a suggestion that she found only negligence. Mr. Conlon, I assume you've probably, in the course of your practice, seen a number of these paragraph 4 certifications. I certainly have, Your Honor. Quite a number. Quite a number. Have you ever seen one that talked about commercial success or other secondary factors? Yes, I have. And I'd like to talk to you a little bit about that. How frequent is that? Well, of these two, one did. All right. Myers did. All right. And what did it say? It said the commercial success, in this case, is due to the need for a drug that would provide an attack to insulin resistance. That's what it said. And that's what pioglitazone is. It's the first, last, and almost only drug that attacks... But I'm really looking for a general practice here. I mean, there's no way I could check on this, so I'm relying on your experience and your candor in saying whether this is a frequent ingredient of the paragraph 4 certification or not. Well, I can't... We had four in this case. Two of them... Of the two that attacked the patent, one of them mentioned the commercial success and dropped it. Mm-hmm. My lads. Alpha Pharma's never even mentioned it. The other two in the case never challenged this patent, probably because of the commercial success, so I think that speaks to it as well. But I think the point is, they're claiming the patent is invalid. If they're claiming the patent is invalid, to the best of their opinion, they have to look at the grand elements. They have to find motivation. They have to find some likelihood of success. They have to look at the evidence of an unobviousness. Including unexpected results. Now, they talk about structural similarity here. The examiner, in this case, looked at the structural similarity. He had not only the closest prior art, but he also had the methyl homologs of each of the four compounds that are claimed in this genus. The methyl homologs, the data was there. The examiner was a skilled chemist. He looked at this, and he said, this is patentable. You don't have a presumption of prima facie case after the patent has been issued. There's no presumption that a patented compound is obvious. There's no presumption of that. This is a very empty and very hollow approach. Oh, it's a close chemical compound, so we can ignore the patent office. We can ignore the commercial success. These guys follow the commercial success. If you look with me to JA212, I wish you would take, if you haven't had this in volume one, JA212. There you'll find, this is Mylan's analysis of P-glitazone and whether they should go after it. And they look at the top of that page at 212, and it says, IMS market analysis. This is commercially available data and information on all the drugs that are being sold. It's available. You have to pay for it. It's not published. It's not free. But it's commercially available, and each of these companies get it. And they say there that in 2000, going from zero sales in July of 1999 to 2000, they had $628 million worth of sales. In 2001, they had $1.1 billion worth of sales. This is one of the fastest drugs to hit a billion-dollar sale in the history of mankind. And they're saying they can ignore that as commercial success? Commercial success is presumed to be attributable to the claimed invention. And I got to say... But that's not a ground for validity. It's a defense to an attack on validity for obvious reasons. Graham said secondary considerations must be considered, and this court has always said since Beatrice Fudin's or I can't remember the early case. Judge Markey said you have to consider all the evidence, including the evidence of non-obviousness. Commercial success, long-felt unsolved need. They had a drug on the market, Rezulin, but they were so anxious for an anti-insulin drug. But the failure to discuss commercial success doesn't necessarily render a statement of invalidity inadequate. If you're making... Inadequate. If it's anticipation... Inadequate. If it was an anticipation objection, you're right. But if it's an obviousness question, you have to address the elements of obviousness. But isn't that a defense that the patentee would then bring forward? Your Honor, if you look with me to J87... JA8703, you have to look it up, I live on it. This is the opinion of their economic expert, where they said, oh, well, it was a very commercial success. And they agreed it was qualifiably commercial success. He went through and analyzed the expenditures of us, of GSK, of everybody else in the market at the time. He used IMS, commercially available information. These guys have it. They follow it. They know what is being spent. They know how these things are being marketed. If something is due not to the invention but is due to marketing, they have an ability to investigate it. A proliferation case is a good thing for an examiner. An examiner can't go out and investigate the actuality of the world. But these guys want to make a trillion dollars on this drug. They're investing to make that money on that drug. They have to use good faith and not ignore any evidence of non-obviousness. They totally ignore unexpected results. Alpha farms, it's not really any different in toxicity, because they found some data not in a two-week test, but in a one-year test or a 13-week test. And they've tried to force that on the judge three or four times during this trial. And they're still forcing it on at least four. That is not a reasonable, it's not an intellectually or scientifically honest approach to this case. That cannot be allowed, and that's what this judge reacted to. So, it is not simply, I certify this is a paragraph four case. If I certify that to the best of our knowledge, this patent is invalid. Anticipation, then you don't have to worry about unexpected results or commercial success or wrongfully. I agree with you. If they're saying it's obvious, they've got to have a good faith opinion that it is. And they can't stick their head in the sand and say that they ignore the evidence that it isn't. They say there's no evidence. She can't test the validity of their latest theory because there's no evidence on it. Wrong. There are only 36 witnesses. I just quoted, and it said, well, A, J, 212, or 229, or something. He said there is no reason to go after that compound. Our expert witness testified on it. Mossberg, Alpha Pharm, they often mention that compound. Alpha Pharm's expert witness said, you can't get anything from that compound. This thing was baseless from the get-go. You're saying that negates good faith. It certainly shows a lack of good faith. They did a look and a promise. As my colleague said, this isn't supposed to be just say, slap something down, let's go. This was slap something down in many cases and let's go. She wasn't. They were not punished for changing their theory. They were punished for throwing false theory and baseless theory at one after the other and coming up with explanations. Mossberg's explanation as to why you would go get compound B, the closest prior art, basically he said, somebody reading this and wanted to do something, they don't go after that. Why? Because Takeda's publication says it's lousy. If it's lousy, then Takeda isn't pursuing it. Then there will be competition with Takeda. They said, well, what about compound 99? 99 didn't have the same strength as compound B, and it didn't have any adverse effects. Why wouldn't they go there? Oh, because Takeda had done a lot of work in that area, so they'd be worrying about Takeda, not thinking about the science. What about inequitable conduct? Inequitable conduct is absolutely no basis for them. One of the problems that I worry about and seems to be proven by this case is that instead of slap something down and let's go, it's slap something down and let's get in discovery and see what we can find. There's some kind of error that we can pin a case of inequitable conduct. Maybe we can scale it enough to get a settlement. Maybe we can do something. This was basis all the way through. The League Council, when we went into the summation, when we started to try, is this something that they intended? I don't know. Probably not. They had all the evidence. They had done all the discovery by that time. They promised some evidence of actual intent. Never came up with a scintilla of it. Never had it. And the basis for it, the basis was, you didn't disclose this compound, this compound here. Well, that compound was the same one that their 3B6 witness said, oh, you wouldn't go there because that also, like the 6-methyl compound, that also would give you weight gain and that sort of thing. You wouldn't go there. That compound, they went all the way through trial saying, no, this is the closest prior, not compound B, this compound that they didn't disclose. But at trial, even their own witness agreed. The closest prior was the prior that Takeda put before the examiner that Takeda showed the data for, hard data of toxicity. You can't ignore that and say that, oh, in 1999 when they filed the 200 patent, it said these training compounds are non-toxic, therefore you must be wrong when you put experimental evidence in showing toxicity. That is not good faith. And that has been the hallmark of this case on both sides, both Takeda, or both Alpha Pharm and my lab. I've got some time left and I've got about a trillion things I could tell you. But if there's any questions, I will just secede the rest of my time. Thank you very much, Mr. Conlon. Thank you very much. We'll give Mr. Haug and Riccosi two minutes each. Thank you. Which is what you asked for. I must say I'm very disturbed to hear my distinguished colleague be of the view that I and my law firm are intellectually dishonest. We represented Alpha Pharm from the very beginning in this case. When they were working on the ANDA for years leading up to the lawsuit. We didn't draw that conclusion from what he said. I think he said it. But in any event, we were there. This lawsuit wasn't filed by Alpha Pharm. It was filed by Takeda. And when the counterclaim was interposed by Alpha Pharm, that the patent was invalid for a number of years. Pursuant to the certification. Correct. It's practically automatic, isn't it? No. Please proceed. But we know the procedures. I know, Your Honor. I'm sorry. In any event, the point I wanted to make is, throughout the proceedings, there was never a challenge under Rule 11 to anything. There was never a sanction issued by Judge Cote for anything. Ever. In fact, you make comments in the record, as you see in our brief, saying that counsel did a great job in work hard in preparing the case. None of this. This was not that kind of a case. Alpha Pharm believed in its case. We as counsel believed in their case. We lost on the merits. I asked the court. What was your case, though, that the whole point of the judge is that Alpha Pharm concedes that the many contradictory justifications were utterly indefensible and fatally flawed? Judge Cote is wrong on the record. We didn't concede that. Dr. Rosenberg never conceded that. Expert Mossberg for Alpha Pharm testified that the lead compound would be selected. And it's pretty obvious. And so I'm not saying, I'm not re-arguing anything. I'm just saying we had a good faith basis to believe in our case. We did believe in our case. Utter failure to show why compound B would be selected as a lead compound. Judge Cote's opinion, Your Honor. And I respect her opinion. But we're talking about bad faith. We're talking about subjective bad faith by Alpha Pharm and its counsel. And that didn't exist in this case. And there's no factual basis. Alpha Pharm was still searching for a viable theory at trial. Again, Judge Cote's opinion. We had a viable theory. Judge Dyke, in a concurring opinion setting, thought two of the claims were likely invalid based on the same rationale as Alpha Pharm had. Close structural similarity and the same utility. But not the claim to the compound in question. Correct, Your Honor. And we lost. And we argued unexpected results. That was a hotly contested issue in the case. We didn't concede unexpected results. How could we? Commercial success. Judge Roy, you're absolutely right. It's a defense. Takeda is the one that raised commercial success to rebut the obviousness challenge. And then we got into commercial success. I think you've saved your time, Mr. Holt. Mr. Riccosi has a couple of minutes. Thank you, Judge. Two quick points. Mylon's inequitable conduct defense did not fall to the level of being asserted with utter lack of all due care. There was no dispute from the district court, from Takeda, or even Fujita, the inventor himself, that there were misstatements of fact in the declaration that he submitted to the PTO regarding how the rat toxicity data was gathered that was in direct response to the examiner's concerns regarding enablement. At the very least, Mylon had a colorable argument of materiality. In addition, there was no dispute that the data in that declaration was, in fact, not from single experiments, but from the inventor's aggregate judgment. He told the PTO, based on these numbers, I know p-glutazone is superior. He admittedly had other data showing that it wasn't. If you're going to tell the PTO that something's superior based on these numbers, you'd better also tell them that you have other data that conflicts with it and that these aren't actual experiments. Let me begin quoting from Judge Quill. Mylon's theory was cobbled together. The claim was always frivolous. Mylon's expert admitted that the compound was not the closest prior art. I could go on and on and on. You realize she didn't just leave this without careful reasoning. No, Your Honor, but it's true. She disagreed at trial with Mylon's materiality. And then she goes on, by the way, not leaving it there, but she goes on for paragraphs about your other litigation misconduct, disobeying court orders, failing to respond to deposition notices, revisiting discovery on the eve of trial. You know the list. I do, Your Honor. But those all fall into her view or the district court's view that somehow Mylon knew that this was baseless from the get-go. It didn't, Your Honor. Once it got the facts from Takeda, it pled in equitable conduct. There was no dispute. There were factual misstatements in that deck. It's true. The district court disagreed with materiality and inference of intent, but that doesn't make it baseless. That just means Mylon lost. Now, my last point is on the notice letter. Again, what is it required to state? A notice letter is not required to have a dead-bang winning theory right off the bat. And let's juxtapose this with traditional patent litigants. They don't have to come to court day one with all of their evidence and theories in the can and ready to go. The statute didn't change that for Hatch-Waxman litigants. Yes, they have to put the other side on notice of what their theory is and their subjective belief of invalidity, but there's no requirement that it has to be a substitute for discovery in trial and that they can't go into a case putting someone on notice of theories, change those theories, narrow them, add to them, in good faith as the federal rules contemplate. And when you hold someone to the notice letter and say, if you change it or if it's baseless from the get-go and you don't allow them to go to that discovery process, you're treating the Hatch-Waxman applicant differently from other patent litigants. Thank you, Mr. Wachowski. Thank you, Judge. I appreciate the excellent arguments on both sides. We'll take the case under advisement. Thank you, Your Honor. Thank you, Your Honor.